IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

SHARON R. DEVINE                                        PLAINTIFF


        v.                     CIVIL NO. 10-3017


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                         DEFENDANT


**MEMORANDUM OPINION**

        Plaintiff, Sharon Devine, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claims for a period of disability and disability insurance benefits

(DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review,

the Court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision.  See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

        The application for DIB presently before this Court was protectively filed on April 25,

2002, alleging an inability to work since October 23, 2001, due to degenerative disc disease, five

herniated discs, chronic pain and depression.  (Tr. 36, 120-123).  For DIB purposes, Plaintiff

maintained insured status through December 31, 2007.[1]  (Tr. 583). An administrative hearing

_____

        [1]The Court notes that a Lead/Protective Filing Worksheet and a Field Office note dated May 7, 2002, indicate
        Plaintiff's date last insured is December 31, 2006.  (Tr. 120, 150-153).

-1-

was held on May 30, 2003.  (Tr. 436-459).  Plaintiff was present and represented by counsel.

In a written decision dated October 31, 2003, the ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform medium work.  (Tr. 32-44).  The Appeals Council vacated this decision on March 31, 2004, and remanded the case back to the ALJ for additional development and a new decision. (Tr. 87-90).  A supplemental hearing was held on September 21, 2004.  (Tr. 460-500).

In a written decision dated November 16, 2004, the ALJ determined that Plaintiff retained the RFC to perform sedentary work. (Tr. 47-58).  On July 26, 2005, the Appeals Council vacated this decision and remanded the case for further development and re-evaluation of the Plaintiff's impairments.  (Tr. 104-106).  A supplemental hearing was held on March 16, 2006.  (Tr. 501-540).

In a written decision dated December13, 2006, the ALJ found that Plaintiff retained the RFC to perform sedentary work with limitations. (Tr. 12-21)  The Appeals Council declined review of the ALJ's decision on July 2, 2007. (Tr. 3-5).  Plaintiff appealed this decision in federal district court.

In a decision dated August 13, 2008, this Court remanded Plaintiff's case back to the Commissioner to further consider Plaintiff's subjective complaints of pain; to more fully explain the reasons for disregarding Dr. Knox's opinion; to ensure that the jobs identified were consistent with the RFC; and to ensure that the directives of the Appeals Council were followed.  (Tr. 557-567).  The Appeals Council vacated the ALJ's decision and remanded Plaintiff's case back to the ALJ on September 2, 2008. (Tr. 570).

By written decision dated December 18, 2009, the ALJ found that Plaintiff has an

impairment or combination of impairments that are severe. (Tr. 547). Specifically, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease, a mood disorder with depression, and anxiety. However, after reviewing all of the evidence presented, he determined that Plaintiff's impairments do not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 547). The ALJ found Plaintiff retained the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) in that the claimant is able to occasionally lift and carry 10 pounds and frequently lift and carry less. She is able to sit for six hours and stand and walk for two hours during and (sic) eight-hour workday. She can frequently handle, finger, and feel and can occasionally push and pull, operate hand and foot controls, and reach overhead. She can occasionally climb, balance, crawl, stoop, kneel and crouch and can occasionally tolerate hazards, heights, chemicals, noise, humidity, pulmonary irritants, temperature extremes and vibrations. She has moderate restrictions in maintaining social functioning and in concentration, persistence and pace. She is moderately limited in the ability to make judgments on simple work-related decisions; appropriately interact with the public, supervisors and co-workers; and appropriately respond to usual work situations and routine work changes. Moderately limited means there is more than a slight limitation but she can perform in a satisfactory manner. She can do work in which interpersonal contact is incidental to the work performed and the complexity of tasks is learned and performed by rote, with few variables and little judgment. The supervision required is simple, direct and concrete.

(Tr. 548-549). With the help of vocational expert testimony, the ALJ found Plaintiff could perform other work as machine tender and an assembler. (Tr. 556).

Plaintiff appealed the decision of the ALJ to the Appeals Council. On January 11, 2010, Plaintiff filed written exceptions to the Appeals Council but later withdrew these exceptions. (Doc. 7, Attachment 1; Doc. 15, Attachment 1). When the Appeals Council declined review, the ALJ's decision became the final action of the Commissioner. Plaintiff now seeks judicial review of that decision. (Doc. 1). Both parties filed appeal briefs and this case is before the undersigned

-3-

pursuant to the consent of the parties.  (Docs. 6, 23, 24).

## II.   Evidence Presented:

At the time of the most recent supplemental hearing held before the ALJ on July 14, 2009, Plaintiff was forty-one years of age and obtained a high school education and some post high school certification.  (Tr. 640, 644).   The record reflects Plaintiff's past relevant work consists of work as a receptionist, a data entry clerk and an office clerk.

The record reflects that prior to the relevant time period, Plaintiff sought treatment for various impairments including sinusitis, back and neck pain, kidney stones, and abdominal pain. (Tr. 249, 252, 254-255, 260, 271, 277, 284, 294-296, 302-307, 392, 401, 422-431).

The pertinent medical evidence during the relevant time period of October 23, 2001, through December 31, 2007, reflects the following.  On October 2, 2001, Plaintiff entered the North Arkansas Regional Medical Center emergency room complaining of chronic back pain that had worsened, nausea and vomiting.  (Tr. 262-264, 391).  Plaintiff was treated and instructed to follow up with Dr. Reese.

On October 2, 2001, Plaintiff came in for a follow-up following his emergency room visit.  (Tr. 251).  Dr. Ronald R. Reese noted Plaintiff had a history of a herniated nucleus pulposus of the cervical spine.  Plaintiff reported that her left arm and shoulder would go numb and that her hand was cold.  Dr. Reese noted Plaintiff would see Dr. Knox on October 25, 2001.

On October 26, 2001, Plaintiff underwent cervical spine x-rays that revealed no demonstration of pathologic motion on flexion and extension to suggest ligamentous instability of the cervical vertebral column. (Tr. 247).  A second imaging revealed "mild narrowing of C5-6 intervertbral discs. No fracture, dislocation or destructive process." (Tr. 248).

-4-

On October 26, 2001, Plaintiff underwent a MRI of the cervical spine that revealed a bulging of the C6-7 greater than the C5-6 disc space which did not appear to be causing significant spinal stenosis or neuroforaminal encroachment. (Tr. 301).

In a letter dated October 31, 2001, Dr. D. Luke Knox wrote that Plaintiff was seen on October 25, 2001, with complaints of marked worsening of pain in her neck and left arm over the past four to six weeks. (Tr. 300). Plaintiff reported she had been unable to work over the last four weeks and had basically taken off the last two weeks. Dr. Knox noted Plaintiff was ready to consider other options. Dr. Knox stated the following:

> Neurologically, I could pick up no evidence of motor or sensory deficit with the exception of a weak triceps on the left and diminished sensation over the C6 dermatome. Reflexes were, for the most part, symmetric with the exception of a slightly diminished brachioradialis on the right. Spurling maneuver was negative.
>
> We reviewed her old x-rays which included the MRI scan from a couple of years ago of her cervical spine. Quite frankly, I am quite impressed with the way those discs looked at that time. I am suspicious that something may have changed, and I asked that she have her MRI scan done over the next day or two.

(Tr. 300). Dr. Knox noted he had prescribed Plaintiff Hydrocodone.

In a letter dated December 19, 2001, Dr. Knox noted Plaintiff was seen on December 13, 2001, with continued complaints of aches and pains with her neck, arm, back, and leg. (Tr. 299). Dr. Knox noted that while Plaintiff reported some improvement, she did not feel that she could return to her job. Dr. Knox noted he gave Plaintiff an okay to return to physical therapy and to remain off of work until she felt able to sustain a desk job for a full eight hours. Dr. Knox noted he had referred Plaintiff to a pain clinic for further evaluation, and that Plaintiff would see Dr. Runnels for conservative spine care.

In a letter dated December 19, 2001, Dr. Knox wrote a letter stating that Plaintiff had been under his care for the last several years for complaints related to her back, leg, neck, and arm pain.  (Tr. 298).   Dr. Knox noted Plaintiff was found to have significant cervical spondylosis, a central disc herniation at L4-5, and lumbar spondylosis. Dr. Knox opined Plaintiff was unable to sit for more than one hour at a time.  Dr. Knox noted Plaintiff was to follow-up with Dr. Runnels in two months and hoped to be able to return to employment.  Dr. Knox noted that when Plaintiff decided to consider surgical options, she was to return to his office.

On December 31, 2001, Plaintiff complained of a sinus infection.  (Tr. 257).  Dr. Ronald R. Reese prescribed medication.  Plaintiff was treated for a sinus infection on January 15, 2002, and January 21, 2002 as well.   (Tr. 257).   Plaintiff was referred to Dr. McGarrah, an otolaryngologist, for evaluation of her sinuses.

On January 9, 2002, Plaintiff was seen by Dr. R. David Cannon upon referral by Dr. Knox.  (Tr. 312-314).  Plaintiff complained of neck and back pain with arm and leg pain. Plaintiff reported she had been off of work because she was unable to sit for any length of time. Plaintiff reported her pain was made worse by riding in a car, sitting, standing or bending forward.  After examining Plaintiff and her radiographic studies, Dr. Cannon diagnosed Plaintiff with a disc bulge of the cervical and lumbar spine, degenerative disc disease - lumbar, cervicalgia, lower back pain, sciatica, left C8 cervical radiculopathy and myofascial pain. Dr. Cannon prescribed a TENS unit and Ultram, and set Plaintiff up for an epidural steroid injection. Plaintiff underwent these injections in March and April of 2002.  (Tr. 308-311).

On February 28, 2002, Plaintiff underwent a CT scan of the sinuses that revealed postoperative bilateral antral windows with no evidence of acute sinusitis or other abnormality.

-6-

(Tr. 261, 390).

In a letter dated April 8, 2002, Dr. Vincent B. Runnels recited Plaintiff's medical history and noted Plaintiff's complaints of low back pain, bilateral hip pain which alternated to both thighs, and that her feet fell asleep if she sat too long. (Tr. 297, 375). After examining Plaintiff, Dr. Runnels prescribed Bextra and Ultram, back exercises, posture correction, and massage and traction for her neck. Dr. Runnels stated Plaintiff had "very minimal disease" and he thought she should be able to return to work in a week or so. Dr. Runnels also recommended Plaintiff get on a diet.

On June 4, 2002, Plaintiff complained of a fever and back pain between the shoulder blades. (Tr. 256).

On June 9, 2002, Plaintiff underwent a Functional Capacity Evaluation performed at Healthsouth. (Tr. 325-332). Plaintiff's perceived abilities included sitting for sixty minutes, standing for sixty minutes, walking for sixty minutes, driving for one hundred twenty minutes, and lifting thirty-five pounds. Plaintiff's gait, posture, flexibility and range of motion were all noted as within normal limits. Based upon her performance, the examiner opined Plaintiff could work within the medium category of work with frequent lifting for an eight hour day.

On July 23, 2002, Dr. Jerry L. Thomas, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds; could stand and/or walk for a total of about six hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; and could push or pull unlimited, other than as shown for lift and/or carry. (Tr. 333-340). Dr. Thomas opined that postural, manipulative, visual, communicative or environmental limitations were not

AO72A
(Rev. 8/82)

evident. On October 7, 2007, after reviewing the record, Dr. Robert Beard affirmed Dr. Thomas's July 23, 2002 assessment. (Tr. 340-342)

On September 12, 2002, Plaintiff underwent a MRI of the cervical spine that revealed a small right-sided HNP at C5-C6. (Tr. 389).

On October 30, 2002, Plaintiff underwent a right carpal tunnel release after complaining of right forearm, wrist and hand numbness. (Tr. 382-386).

On December 20, 2002, Plaintiff entered the North Arkansas Regional Medical Center emergency room reporting that she had been playing with her eight month old puppy that had jumped up and scratched her in the left eye. (Tr. 387). Plaintiff was diagnosed with a corneal/conjunctival abrasion. Plaintiff was prescribed medication and instructed to follow-up with an ophthalmologist.

In a letter dated April 17, 2003, Dr. Ryan Kaplan stated Plaintiff had been referred to him for neck and lower back pain. (Tr. 347). Plaintiff reported that moving around made her pain worse and that lying down made her pain better. Dr. Kaplan stated that he performed an electrodiagnostic examination of Plaintiff's lower extremities which was normal. Upon examination, Dr. Kaplan stated that he thought he found some mild weakness in Plaintiff's left deltoid muscle. Dr. Kaplan stated that Plaintiff's EMG study was unremarkable and there was no evidence of radiculopathy or plexopathy. Dr. Kaplan stated Plaintiff's normal EMG and fairly unremarkable lumbosacral MRI made him disinclined to recommend surgery. Dr. Kaplan opined that physical therapy would be the best modality of intervention. Dr. Kaplan noted that Plaintiff had been undergoing physical therapy and that Plaintiff reported it had made her pain worse. Plaintiff was given a prescription for Neurontin. Due to some weakness in Plaintiff's left upper

AO72A
(Rev. 8/82)

extremity, Dr. Kaplan stated he would do a left upper extremity EMG when Plaintiff returned to the office.

In a letter dated June 9, 2003, Dr. Kaplan, stated he was following Plaintiff for numerous neurological symptoms. (Tr. 345). Dr. Kaplan stated that since Plaintiff's last visit with him, she reported that the Neurontin had helped her pain about seventy percent. Dr. Kaplan stated the following:

> Her neck pain has also resolved ever since she quit her job. Today I performed an electrodiagnositc examination of her left upper extremity, in the hopes of trying to find a neurogenic explanation for possible left deltoid weakness. This study came back completely normal. There was no evidence of an upper extremity radiculopathy, plexopathy, or mononeuropathy.

> At this time, I really do not have a neurologic explanation for her complaints. As the Neurontin is helping, I will plan on continuing it for two months' time. I will then see her back and will start titrating this down.

(Tr. 345).

On July 17, 2003, Plaintiff underwent a consultative psychological evaluation performed by Dr. Stephen R. Harris. (Tr. 350-355). Dr. Harris noted Plaintiff was a clean neatly dressed person with an erect posture and a regular gait. Plaintiff reported that she had pain "most of the time" and that she was depressed and felt hopeless. Plaintiff reported she was first treated for depression after she had her twin boys. Plaintiff reported she started having back pain in 1985 after being involved in a motor vehicle accident that resulted in the death of her sister. Plaintiff reported she had never had any psychological or psychiatric treatment. Dr. Harris noted Plaintiff appeared to hold back quite a bit. After evaluating Plaintiff, Dr. Harris stated Plaintiff appeared to be an individual in the average range of intellect who had physical difficulties that caused her pain and problems with daily activities. Dr. Harris indicated that Plaintiff appeared to have a

-9-

rather significant depression possibly of a long standing nature.  Dr. Harris opined that Plaintiff would benefit from psychological and/or psychiatric treatment concerning her depression and working through some of the difficulties with the loss of her sister.

On July 17th, Dr. Harris also completed a medical assessment of ability to do work-related activities (mental) form.  (Tr. 356-357).  With regard to occupational adjustments, Dr. Harris opined Plaintiff had a good ability to follow work rules, use judgement, function independently, and maintain attention and concentration; and a fair ability to relate to co-workers, deal with the public, interact with supervisors, and deal with work stresses.  With regard to making performance adjustments, Dr. Harris opined Plaintiff had an unlimited/very good ability to understand, remember and carry out simple job instructions; and a good ability to understand, remember and carry out complex job instructions, and understand, remember and carry out detailed, but not complex, job instructions.  With regard to personal-social adjustments, Dr. Harris opined Plaintiff had an unlimited/very good ability to maintain personal appearance; and between a good and fair ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.

On December 2, 2004, Plaintiff was treated for an acute onset of left jaw/TMJ pain.  (Tr. 326-363).  Plaintiff was treated and Lorcet was prescribed for pain on December 9, 2004, and December 15, 2004.  Treatment notes indicated Plaintiff was to follow-up with her general practitioner for splint therapy.

On December 7, 2004, Plaintiff underwent a neuropsychological evaluation performed on Dr. Vann Arthur Smith.  (Tr. 358-361).  After evaluating Plaintiff, Dr. Smith opined that Plaintiff's clinical history, mental status examination and neuropsychodiagnostic screening test

-10-

profile data reflected a pattern of abnormal findings consistent with the presence of bilateral, diffuse organic brain dysfunction of mild to moderate severity and static to slowly progressive velocity. Dr. Smith opined that the findings were compatible with Plaintiff's clinical history of chronic pain and a thyroid disorder. Dr. Smith diagnosed Plaintiff with Axis 1: organic brain dysfunction, secondary to Axis III conditions; Axis III: thyroid disorder, by history, TBI by history, DDD, and chronic pain syndrome. Dr. Smith opined Plaintiff's GAF score to be 65-70 with her highest GAF being 80. Dr. Smith opined that Plaintiff was disabled at that time.

On October 17, 2005, Plaintiff underwent a consultative psychological evaluation performed by Dr. Harris. (Tr. 364-371). Dr. Harris noted Plaintiff was a clean neatly dressed person with an erect posture and a regular gait. Plaintiff reported she was applying for disability because she was depressed and had back pain "all of the time." Plaintiff reported that she did not feel like leaving her house and that she did not feel like getting out of bed in the morning. Plaintiff reported that her family just received health insurance in March so that she could now get some treatment. Dr. Harris noted Plaintiff exhibited a "good bit of repositioning" during the evaluation. Plaintiff reported her medications consisted of Synthroid, Effexor and Neurontin. After examining Plaintiff, Dr. Harris opined Plaintiff was of average intellect who showed very definite depressive characteristics that seemed to increase some physical difficulties. Dr. Harris opined that Plaintiff would have difficulty in many interpersonal relationships.

On October 17th, Dr. Harris also completed a medical assessment of ability to do work-related activities (mental) form. (Tr. 372-374). Dr. Harris opined that Plaintiff would have slight limitations in four areas of functioning. Dr. Harris noted Plaintiff was moderately limited in her ability: to make judgements on simple work-related decisions; to interact appropriately with the

-11-

public; to interact appropriately with supervisor(s); to interact appropriately with co-workers; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting.

On March 13, 2006, Dr. Vann Arthur Smith completed a mental RFC questionnaire opining Plaintiff's current global assessment of functioning score was 65, and her highest in the past year was 80. (Tr. 376-380). Dr. Smith opined Plaintiff's prognosis was fair. Dr. Smith noted Plaintiff's signs and symptoms were as follows: mood disturbance; difficulty thinking or concentrating, psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities; easy distractibility; memory impairment - short, intermediate or long term; and sleep disturbance. Dr. Smith opined Plaintiff was seriously limited, but not precluded or unable to meet competitive standards in four of twenty-five areas of functioning; and unable to meet competitive standards in eight of the twenty-five areas of functioning. Dr. Smith further opined Plaintiff would miss more than four days per month due to her impairments.

On May 10, 2006, Plaintiff underwent an orthopaedic examination performed by Dr. Ted Honghiran. (Tr. 432-435). Dr. Honghiran noted that Plaintiff complained of neck and back pain that had been treated conservatively with medications and physical therapy. Plaintiff reported that her pain had continued to worsen since she last saw Dr. Knox in 2001, but she had not returned to Dr. Knox because she did not have insurance. Plaintiff reported that even though she now had insurance she did not think she needed to return to Dr. Knox because she did not want to have surgery. Plaintiff reported she underwent steroid injections and experienced no

-12-

improvement in her pain.  Plaintiff had also tried a TENS unit to control her pain. Plaintiff

reported her medications consisted of Aleve and Ibuprofen.  Plaintiff reported she stayed at home

and took care of her two children that were nine years of age.  Upon examination, Dr. Honghiran

noted Plaintiff was able to walk normally; and to get up on her toes and heels without problems.

Plaintiff's lumbar spine range of motion was complete with ninety degrees of flexion, twenty-

five degrees of extension, with lateral flexion to twenty-five degrees with no pain.   Dr.

Honghiran noted no acute muscle spasms, and that Plaintiff's straight leg rasing was negative

on both sides.   Plaintiff also had normal reflex and sensation.   Dr. Honghiran noted an

examination of Plaintiff's cervical spine revealed fifty degrees of flexion, sixty degrees of

extension, and lateral flexion to forty-five degrees on both sides with normal reflex and sensation

and no pain or muscle spasms.  Dr. Honghiran also reviewed MRIs of Plaintiff's lumbar and

cervical spine.  Dr. Honghiran's impression stated:

> It is my impression that Ms. Devine has a history of having chronic neck and
> back pain, with evidence of degenerative disc disease at C6-7 and also a bulging
> disc at L4-5 of the lumbar spine, with minimal degenerative disc disease
> condition.  Her condition is quite benign, even though she feels it is getting worse
> with increasing pain.

(Tr. 433).  Dr. Honghiran opined Plaintiff should be able to do computer work that did not

require heavy lifting of more than thirty pounds, long-standing, or walking. Dr. Honghiran also

completed a medical assessment opining that Plaintiff could frequently lift and/or carry twenty

pounds, occasionally up to one hundred pounds; sit for six hours in an eight-hour day; stand/walk

two hours in an eight-hour day; and occasionally perform postural activities.  (Tr. 435).

After the relevant time period, Plaintiff underwent the following consultative evaluations.

On September 21, 2009, Plaintiff underwent a consultative general physical examination

-13-

performed by Dr. Shannon Brownfield.[2] (Tr. 625-629).  Dr. Brownfield noted Plaintiff's range

of motion in her extremities was normal; Plaintiff's cervical spine flexion was zero to fifty

degrees (0 to 60 is normal), extension was zero to fifty degrees, and rotation was zero to sixty

degrees (zero to eighty is normal); and Plaintiff lumbar flexion was within normal limits.  Dr.

Brownfield noted no muscle spasms and negative straight leg raising tests.  Plaintiff did not have

muscle weakness or atrophy.   Plaintiff's gait and coordination was noted as normal.  Upon a

limb function evaluation, Dr. Brownfield noted Plaintiff was able to hold a pen and write; to

touch fingertips to palm; to grip normally; to oppose thumb to fingers; to pick up a coin; to stand

and walk without assistive devices; to walk on heel and toes; and to squat and arise from a

squatting position.  Dr. Brownfield diagnosed Plaintiff with clinical depression that was

untreated and questioned if Plaintiff had post-traumatic stress disorder; and chronic neck and low

back pain with a history of degenerative disc disease with radiation symptoms in the left

arm/hand.  Dr. Brownfield opined Plaintiff was moderately to severely limited with prolong

positions, walking, and lifting over twenty pounds.  Dr. Brownfield noted Plaintiff also had

moderate to severe limitations secondary to her depression.

On September 30, 2009, Plaintiff underwent a third mental diagnostic evaluation

performed by Dr. Harris.  (Tr. 630-635).   At the time of the evaluation, Plaintiff was taking

Synthroid.  Dr. Harris noted that other than being treated by her family physician, Plaintiff had

had no treatment for emotional or mental difficulties.  Dr. Harris noted that during this

evaluation, Plaintiff talked about the accident that occurred in 1985, and that while she had said

---

[2]The Court notes that the ALJ listed the date of this evaluation as 2002.  (Tr. 552).  The Court finds this to be a typographical error.

-14-

her sister had been driving at the time, it was actually Plaintiff that was driving prior to the accident.  Dr. Harris noted that Plaintiff drove herself to the evaluation, that Plaintiff was casually dressed, and that Plaintiff had an erect posture and a regular gait.  Dr. Harris noted Plaintiff showed a little bit of repositioning throughout the evaluation, and that Plaintiff became tearful when she was recounting the accident and revealing her feelings about the past situation.  Plaintiff reported that her interests were her boys, and that she enjoyed watching them in sports.  Plaintiff reported that she was tired most of the time and that she and her husband did not go out often except to watch the boys.  Dr. Harris diagnosed Plaintiff with a depressive disorder, an anxiety disorder and a pain disorder.  Dr. Harris noted that Plaintiff could take care of her personal hygiene, drive, and shop for the household.  Plaintiff reported that she did not clean a lot.  With regard to communicating, Dr. Harris noted that Plaintiff appeared to be somewhat withdrawn and that she had little social interaction.  Dr. Harris noted that Plaintiff seemed to focus her emotional difficulties upon her physical complaints, and that Plaintiff may have difficulties in coping with work-like tasks if she was stressed.  Dr. Harris opined that if Plaintiff was able to keep a relatively level stress level, she would be able to work on tasks to completion.  Dr. Harris opined that Plaintiff needed further counseling and work to help her cope with stress and anxiety which was more than likely due to guilty feelings.

On October 2, 2009, Dr. Harris also completed a medical source statement of ability to do work-related activities (mental) opining that Plaintiff was mildly limited in her ability to understand and remember simple instructions; to carry out simple instructions; to make judgments on simple work-related decisions; to understand and remember complex instructions; to carry out complex instructions; and to make judgments on complex work-related decisions.

-15-

(Tr. 636-637).  Dr. Harris opined Plaintiff was between mild and moderately limited in her ability to interact appropriately with the public; to interact appropriately with supervisors; to interact appropriately with co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting.  Dr. Harris indicated that Plaintiff had had these limitations since approximately 2003.

**III.   Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A),

-16-

1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. § 404.1520.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. § 404.1520.

## IV.    Discussion:

Plaintiff contends that the ALJ erred in concluding that the Plaintiff was not disabled prior to December 31, 2007, her date last insured.  Defendant argues substantial evidence supports the ALJ's determination.

### A.    Insured Status:

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability.  42

-17-

U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on December 31, 2007.  Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of October 23, 2001, her alleged onset date of disability, through December 31, 2007, the last date she was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB she must prove that, on or before the expiration of her insured status she was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death.  Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984).  The medical evidence of Plaintiff's condition subsequent to the expiration of Plaintiff's insured status is relevant only to the extent it helps establish Plaintiff's condition before the expiration.  Id. at 1169.

### B.    Subjective Complaints and Credibility Analysis:

We first address the ALJ's assessment of Plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a

-18-

claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.  Although Plaintiff contends that her impairments were disabling prior to the expiration of her insured status, the evidence of record does not support this conclusion.

With regard to Plaintiff's back and neck impairments, the record reflects that Plaintiff sporadically sought treatment for these impairments during the relevant time period.  In October of 2001, Dr. Reese noted Plaintiff had a history of a herniated nucleus pulposus of the cervical spine and referred Plaintiff to Dr. Knox.  In December of 2001, Dr. Knox noted that Plaintiff had significant cervical spondylosis, a central disc herniation at L4-5, and lumbar spondylosis, and opined that Plaintiff would be unable to sit for more than an hour at a time.  Dr. Knox then referred Plaintiff to Dr. Runnels for further care.  In April of 2002, after examining Plaintiff and reviewing her medical history, Dr. Runnels prescribed medication, back exercises, posture correction, and massage and traction of the neck. Dr. Runnels also said Plaintiff had "very minimal disease" and opined Plaintiff could return to work in a "week or so."

In June of 2002, Plaintiff underwent a Functional Capacity Evaluation and the therapist opined Plaintiff could perform medium level work.  The record revealed that Plaintiff saw Dr. Kaplan in April of 2003 with complaints of neck and back pain, and Dr. Kaplan prescribed Neurontin.  At Plaintiff's follow up visit with Dr. Kaplan in June of 2003, Plaintiff reported that the Neurontin had helped her pain "about seventy percent." Dr. Kaplan's notes also showed that Plaintiff underwent EMG studies of her lower extremities and upper left extremity that were

-19-

normal.  Dr. Kaplan indicated that he had no neurologic explanation for Plaintiff's complaints

and that, because the Neurontin was helping, he would continue Plaintiff on the medication and

see her back in two months.  There is no record that Plaintiff returned to Dr. Kaplan and in fact

Plaintiff was not seen by a physician for her complaints of back and neck pain again until a

consultative evaluation in May of 2006 performed by Dr. Honghiran.  After examining Plaintiff,

Dr. Honghiran opined that Plaintiff's condition was "quite benign" and that Plaintiff could

perform light work with some limitations.

Plaintiff did not seek treatment for her back pain again until a consultative examination

in September of 2009, almost two years after her insured status had expired.  At that time, Dr.

Brownfield noted that Plaintiff's range of motion in her extremities was normal; Plaintiff's

cervical spine flexion was zero to fifty degrees (0 to 60 is normal), extension was zero to fifty

degrees, and rotation was zero to sixty degrees (zero to eighty is normal); and Plaintiff's lumbar

flexion was within normal limits.  Dr. Brownfield noted no muscle spasms and negative straight

leg raising tests.  Plaintiff did not have muscle weakness or atrophy.   Plaintiff's gait and

coordination was noted as normal. Upon a limb function evaluation, Dr. Brownfield noted

Plaintiff was able to hold a pen and write; to touch fingertips to palm; to grip normally; to oppose

thumb to fingers; to pick up a coin; to stand and walk without assistive devices; to walk on heel

and toes; and to squat and arise from a squatting position.

While Plaintiff may indeed experience some degree of pain due to her back and neck

impairment, the Court finds, based on the evidence recited above, that there is substantial

evidence supporting the ALJ's finding that Plaintiff's back impairment was not disabling during

the relevant time period.  See Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (upholding

-20-

ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

While Plaintiff alleged an inability to seek treatment due to a lack of finances, the record is void of any indication that Plaintiff had been denied treatment due to the lack of funds. Murphy v. Sullivan, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship). The record also reveals that in October of 2005, Plaintiff reported to Dr. Harris that her family obtained access to health insurance in March of 2005, and that she could now obtain treatment. However, the record fails to show that Plaintiff sought treatment for her disabling pain.

As for Plaintiff's alleged depression and anxiety, there is no medical evidence of record revealing that Plaintiff sought on-going and consistent treatment for her alleged depression and anxiety during the relevant time period. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability). In addressing Plaintiff's mental impairments, the ALJ noted that Plaintiff was mildly restricted with activities of daily living. The ALJ pointed out that the record revealed Plaintiff was able to take care of her daily needs, drive, shop for groceries, and care for her twin sons. With regard to social functioning, the ALJ found Plaintiff had moderate limitations. In making this finding the ALJ pointed out that Plaintiff had been married for twenty years and that Plaintiff was able to go out and watch her sons play sports.

-21-

However, the ALJ also noted that Dr. Harris found Plaintiff was somewhat withdrawn and had little interaction.  As for Plaintiff's concentration, persistence, and pace, the ALJ opined that Plaintiff had moderate difficulties.  The ALJ based this finding on Dr. Harris's observation that Plaintiff seemed to focus her emotional difficulties upon her physical complaints and that Plaintiff could have some difficulties with work-like tasks if she felt stressed.  The ALJ pointed out that Dr. Harris also opined that Plaintiff's stress level could cause Plaintiff to have difficulty in attention, concentration, persistence and pace.  The ALJ found no evidence of decompensation.  After reviewing the evidence of record, the Court finds substantial evidence to support the ALJ's finding that during the relevant time period, Plaintiff did not have a disabling mental impairment.

Plaintiff's subjective complaints are also inconsistent with evidence regarding her daily activities.  In a Supplemental Outline dated May 9, 2002, Plaintiff reported that she was able to take care of her personal needs; to perform most household chores which included some yard work and using a riding lawn mower; to shop and do errands. (Tr. 163-166).  It is also noteworthy that Plaintiff testified at a September 2004 administrative hearing that she was the sole care-giver to her six year old twin sons during the workweek because her husband worked out of town.  On September 30, 2009, well after Plaintiff's insured status had expired, Plaintiff reported she was able to take care of her personal hygiene, drive, shop for the household, and clean the house but not often.  This level of activity belies Plaintiff's complaints of pain and limitation and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a Plaintiff's subjective allegations of disabling pain.  See Hutton v. Apfel, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by

-22-

substantial evidence where daily activities– making breakfast, washing dishes and clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability)

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, she has not established that she was unable to engage in any gainful activity during the relevant time period.   Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### C.    RFC Assessment:

We next turn to the ALJ's assessment of Plaintiff's RFC.  RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel,  245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

In finding Plaintiff able to perform sedentary work with limitations,  the ALJ considered Plaintiff's subjective complaints, the medical records of her treating and examining physicians, and the evaluations of the non-examining medical examiners.

-23-

With regard to the opinions of Plaintiff's treating and examining physicians, the ALJ stated that he gave these assessments significant weight.  However, the ALJ found the opinion of Dr. Knox in December of 2001 persuasive only to the extent that it was consistent with the RFC findings.  In addressing Dr. Knox's opinion that Plaintiff could sit less than an hour at a time, the ALJ noted that this finding was inconsistent with Dr. Knox's prior records that indicated Plaintiff's back was "ever-so-slightly better."  Davidson v. Astrue, 501 F.3d 987, 990-91 (8th Cir. 2007) (finding ALJ correctly discounted a physician's assessment report when his treatment notes contradicted the report).  In determining to not give Dr. Knox's opinion more weight, the ALJ also pointed out that Dr. Knox's opinion was inconsistent with the April of 2002 opinion of Dr. Runnels, a treating neurologist, who found that Plaintiff " had a very minimal disease" and should be able to return to work "in a week or so."  The ALJ also pointed out that Dr. Runnels found that Plaintiff's EMG tests in her arms and legs were normal, that Plaintiff's lumbar MRI was fairly unremarkable, and that Plaintiff's cervical MRI did not indicate neural impingement.   In discussing the medical opinions, the ALJ also noted that Dr. Honghiran, a consultative examining orthopaedic physician, opined in May of 2006 that Plaintiff's condition was "quite benign" even though Plaintiff felt it was getting worse.   The ALJ also noted that well after Plaintiff's insured status had expired, Dr. Brownfield, a consultative examiner, opined that Plaintiff would have moderate to severe limitation with prolonged positions, walking and lifting over twenty pounds.

With regard to Plaintiff's mental limitations, in deciding not to give controlling weight to Dr. Smith's opinion that Plaintiff was seriously limited, but not precluded or unable to meet competitive standards in twelve of twenty-five areas of functioning, and that Plaintiff was therefore disabled, the ALJ noted that Dr. Smith's findings were not consistent with the record

-24-

as a whole. <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012 (8th Cir. 2000)(the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole). The ALJ pointed out that the restrictions identified were extrapolated exclusively from a self-report by the Plaintiff and a one-time examination. The ALJ found that there was no indication that Plaintiff's medical history or longitudinal functioning was taken into consideration when Dr. Smith completed his assessment of Plaintiff's abilities. Accordingly, the ALJ afforded Dr. Smith's opinion little weight. The Court finds that substantial evidence of record supports this determination.

The ALJ also considered the opinion of Dr. Harris who performed three separate evaluations of Plaintiff. The ALJ pointed out that Dr. Harris found that Plaintiff functioned within the average range of intellect and that she experienced significant symptoms of depression. The ALJ also noted that Dr. Harris opined that Plaintiff maintained a GAF score of 57 which has been associated with moderate impairment in occupational functioning. <u>Martise v. Astrue</u>, 641 F.3d 909, 919 (8th Cir. 2011)(according to the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV), a GAF of 51 to 60 indicates moderate symptoms)(citations omitted).

Based on our above discussion of the medical evidence and Plaintiff's activities throughout the relevant time period, the Court finds substantial evidence of record to support the ALJ's RFC determination.

**C.     Hypothetical Question to the Vocational Expert:**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.

AO72A
(Rev. 8/82)

Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that prior to the expiration of her insured status, Plaintiff's impairments did not preclude her from performing work as a machine tender and an assembler. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.    Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

DATED this 18th day of November 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-26-

AO72A
(Rev. 8/82)